

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-12-00137-CV

| | | |
|---|---|---|
| In the Interest of B.R., B.R., and B.E.R., Children | § | From the 30th District Court |
| | § | of Wichita County (11750-JR-A) |
| | § | January 4, 2013 |
| | § | Opinion by Justice Gardner |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Anne Gardner


IN THE INTEREST OF B.R., B.R.,
AND B.E.R., CHILDREN

----------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellants B.E.R. (Father) and C.R. (Mother) appeal the trial court's judgment terminating their parental rights to their three children: Bethany, Brittany, and Brandon.[2]   In three issues, Father argues that the evidence is

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for all children named in our opinion to protect their identities.  *See* Tex. R. App. P. 9.8(b)(2).

factually insufficient to support the jury's findings on statutory endangerment and the children's best interest. Mother argues in one issue that the evidence is legally and factually insufficient to support the jury's best interest finding. We affirm.

## II. Background

Mother and Father have five children: Blake, Bradley, Bethany, Brittany, and Brandon.[3] Bethany, Brittany, and Brandon were deposed in July 2011 and again in 2012. At the time of the 2012 depositions, Bethany was thirteen, Brittany was twelve, and Brandon was ten.

Trial was in March 2012, and the children's 2012 depositions were played for the jury. Bethany testified that there had always been some sort of violence between her parents. Bethany testified that she saw Father hit Mother, that there were times when she could not see Father hit Mother but heard punching sounds, and that Mother also hit Father. She testified that she was scared when her parents fought and that she was afraid that Father would take their arguments out on her. She also testified that she felt like her parents did not love each other when they fought.

Brittany testified that Father hit Mother and that she went to her room when her parents fought.[4] She testified that she had heard Mother cry when Father hit

---

[3]Only Bethany, Brittany, and Brandon are involved in this appeal.

[4]Bethany and Brittany testified that when they used the term "fighting," it included hitting.

3

her and that Mother had told her that she hit Father. She also testified that it was scary when her parents fought and that she was afraid that she or her siblings would get hurt. Brandon testified that he saw Father hit Mother several times. He testified that he went to his room but that he still heard slapping sounds and Mother crying. Brandon testified that he was scared that Mother would get really hurt. He also testified that he saw Mother hit Father.

In October 2009, the Department of Family and Protective Services (the Department) removed Bethany, Brittany, Brandon, and Bradley after the police and SWAT team arrested Father for assault family violence. Police records admitted at trial indicated that Bradley asked his girlfriend to call the police because he heard what sounded like Mother being hit and choked. The records further indicated that when police arrived at Mother and Father's home, all of the lights were off, and no one answered the door. Father testified that after the second doorbell ring, he looked out his window and saw a police officer in his yard. Father also testified that he and Mother decided that the police were there to arrest Mother.[5] Father testified that he "did not have a need to open up the door" and that he went back to bed.[6] Father testified that Mother then heard

---

[5]Father testified that he thought the police were there to arrest Mother because she had been to jail twice before.

[6]When asked if he went to bed thinking that there was a police officer hiding behind the bushes in his front yard, Father replied, "Absolutely."

4

police call his name and that he got out of bed and went outside. Father was arrested when he exited the home.

Several officers reported that they observed red marks on the right side of Mother's neck and a bruise on her mouth that appeared to be covered with make-up. Mother testified that she did not have any bruises. The police reports stated that Mother was uncooperative, insisted that no one had been assaulted, refused to allow police to photograph her, and expressed her hatred of police. Father testified that he did not assault Mother.

After the removal, the trial court ordered the Department to return Bethany, Brittany, and Brandon to Mother through a six-month monitored return.[7] Father testified that he was ordered to leave the home during the monitored return and that he lived with his mother, M.R., for three months and then lived alone in an apartment for three months.[8] Mother testified that she knew Father was not allowed contact with the children, but she allowed the children to make videos on her phone that she sent to Father. Bethany and Brittany testified that Mother took them to see Father during the monitored return and told them not to tell anyone, but Mother disputed that testimony. Bethany, Brittany, and Brandon testified that no one was hit or choked, that there was not much screaming and

---

[7]Mother testified that she agreed to allow Bradley to remain in the permanent custody of the Department.

[8]Father testified that he did not work during that time and that M.R. and Mother paid his bills.

5

yelling, and that things were better in their home when Father did not live with them. Father testified that he returned to the home in May 2010.

Mother testified that she left Father in September 2010 to have an affair with a woman who she worked with.[9] She testified that she told her girlfriend that she left Father because she did not want to argue with him anymore. Bethany testified that Mother left because she was tired of Father hitting her. The children remained in the home with Father while Mother was gone from September until October 2010. Mother testified that Father did not work while she was gone and that she left less than $1,000 in a bank account for Father to use to support the children.[10]

Mother testified that she stayed in a hotel and then went to First Step, a battered woman's shelter. She testified that she went to First Step for shelter, not for the services they provide. The police were dispatched to First Step in September 2010. Mother told police she was staying at First Step due to domestic violence issues involving Father and that Father had followed her from Wal-Mart to First Step. According to the police report, Mother yelled at Father to leave her alone, and he continued to approach Mother even after police ordered him to stop. The police then pointed a gun at Father and ordered him back to his vehicle. The report also stated that Father had a knife in his front pocket and a

_____

[9]Mother testified that this was her second affair but her first homosexual relationship.

[10]Mother testified that she supported herself with her paycheck.

6

metal baseball bat in his vehicle. Mother denied that she yelled at Father and testified that she did not see a knife or baseball bat or the police point a gun at Father. Mother also testified that she was not concerned when Father followed her to First Step.

In October 2010, Bethany told her school counselor that Father had "'kind of' choked her," and the Department again removed the children from the home. Bethany testified that she also told her school counselor that she was afraid of Father and that Father was physical with her. Father testified that when Department investigators came to his house, he would not allow them to speak to his children unless he was in the room. He also testified that he told the children not to talk to the Department unless he was present and that he instructed them to call him if the Department came to their school. Father testified that he took the Fifth Amendment multiple times at the adversary hearing when asked about hitting and choking his children. He testified that he was then ordered to have no further contact with the children.

Mother testified that she and Father agreed that the children were not to associate with friends outside of school if Mother and Father were not present. Mother testified that they did not allow the children to stay overnight at a friend's house, have friends visit the home, attend birthday parties, talk on the telephone unless it was to a family member, or go anywhere without Mother and Father watching them. Father testified that he did not allow the children to answer the door at his house, play in the front yard, or play with friends unless he could see

7

them. Bethany testified that her parents only allowed her to answer the door for her brothers and that she was not allowed to answer the door for the police. She testified that she had never been to a birthday party and that she had never had a friend visit her house. Bethany testified that she did not have a life outside her parents' home and that she and her siblings were kept in isolation when they were not in school. Brittany testified that Father would not allow her to spend the night at a friend's house, talk on the phone to friends, or answer the door at their house.

Bethany acknowledged that her 2011 and 2012 testimonies differed and that she did not tell the truth in her 2011 deposition.[11] In her 2011 deposition, Bethany stated that Father hit her only in August 2010, but she stated in her 2012 deposition that Father also hit her in September and October 2010 and that he hit her before Mother left in September 2010. She also testified during the 2012 deposition that she did not know how many times Father had hit her because he hit her "all the time." During the 2011 deposition Bethany testified that Father had choked her twice, but she testified in 2012 that Father had actually choked her over five times. Bethany also testified in 2012 that Father had choked, punched, and slapped her in the face, stomach, arm, and back. She testified that Father told her it was her fault that he had to choke her, that Father had choked her because she smiled at a boy in the grocery store, and

---

[11]Bethany suggested that she was untruthful in her first deposition because she did not remember or did not want to remember.

8

that he had never apologized to her for hurting her.[12]  Father testified that he was upset with Bethany when she winked and smiled at a boy in the grocery store, but he denied assaulting her.  Bethany also testified that she saw Father hit every one of her family members and that Father hit her more than the other children, that she and Father had argued almost nightly, and that Father had told her not to tell anyone about the arguments and fighting.

Brittany testified during her 2012 deposition that she saw Father hit Bethany and that he hit Bethany the most out of the three children.[13]  Brittany testified that she was reading a book while Father was talking and that he took the book out of her hand and hit her on the shoulder with it.  She also testified that Father did not want her to tell people what happened in their home and that he told her, "[W]hatever is in this house stays in the house."

Brandon testified that Father tried to spank him because he did not clean his room.  He testified that when he tried to avoid the spanking, Father threw him on the couch and choked him with both hands.  Brandon testified that he could not breathe when Father choked him and that it hurt and scared him.  He testified that Father had not apologized for choking him.  Brandon also testified that he saw Father hit Bethany and choke his oldest brother Blake.

---

[12]Bethany testified during the 2011 deposition that she remembered smiling at a boy but did not remember that Father choked her.

[13]Brittany acknowledged that she testified in 2011 that she had not seen Father hit Bethany.

Bethany testified that she first disclosed that Father checked her to see if she was having sex in September 2011. Bethany and Brittany each testified that Father told them to come into his bedroom, remove their pants and underwear, and lie down on his bed.[14] They testified that Father told them to spread their legs and that Father then looked at their private areas below their waists.[15] Bethany testified that Father told her he checked her because he thought she did something with a boyfriend, and Brittany testified that Father told her he checked her to see if she had sex with a boy.

Bethany testified that Father first checked her when she was ten and that he checked her twice a month. Brittany testified that she was in elementary school when Father first checked her and that she did not remember how often he checked her. She testified that she initially told CPS that Father did not check her because she was embarrassed and afraid that Father would find out if she told the truth. Brittany testified that Father told her not to tell anyone that he checked her. She testified that she did not ask Father to stop checking her because she was afraid to make him angry.

---

[14]Brittany testified that Father checked her and Bethany separately and that she did not remember if Bethany was in the room when she was checked. Bethany testified that she saw Father check Brittany twice a month.

[15]Bethany and Brittany each affirmatively answered questions that their private area is the part on their body below their belly button and above their knee.

Father denied checking Bethany and Brittany. He testified that he talked to Bethany about sex when she was nine and that he asked her if she was having sex when she was eleven and when she was twelve, but he testified that she denied having sex both times. Bethany testified that she was not having sex. She also testified that Father wanted to put her on birth control when she was ten because he was afraid she would get pregnant. Father testified that he asked Brittany about sex when she was ten and that he asked her when she was eleven if she was having sex. Brittany testified that she told Father she was not having sex but that he did not believe her.

Father testified that he had not worked since February 2011 and had not applied for a job since May 2011. He testified that he worked for the Electra Police Department from 1994 until 1995 and then worked for the Forest Hill Police Department from 1995 until 1999.[16] He testified that the Forest Hill Police Department fired him in 1999. On June 4, 1999, the Forest Hill Police Department placed Father on indefinite suspension for employee misconduct. The indefinite suspension letter stated that Father had confronted Arlington police officers on November 14, 1998, attempted to influence them in Mother's

---

[16]Father testified that he was an employee with the Electra Police Department starting in the summer of 1995 after first serving as a volunteer reserve employee.

11

arrest, and was untruthful to the internal investigating officer concerning the incident.[17] Father denied having done so.

The jury heard other evidence of Father's disciplinary history at the Forest Hill Police Department. When a tow truck driver attempted to repossess Father's vehicle, Father approached the driver and threatened to shoot him. The Arlington police arrived, and Father displayed his weapon and identified himself as a Forest Hill police officer. On a separate occasion, an Aaron's Rental employee attempted to repossess Father's personal property, and Father became physical with the employee.[18] Father also had five other disciplinary incidents while working for Forest Hill Police Department.

Father testified that he had not tried to obtain another law enforcement job and that he was unemployed from 1999 until 2005 because he had problems with depression, anxiety, and headaches. He testified that he held various other jobs for a few months at a time but that he quit because they were either too stressful or not in a management position. Mother testified that Father had quit two jobs because she and Father believed the jobs were beneath his capabilities. Father testified that he did not feel well enough to get a job, but that he would

---

[17]Forest Hill Police Department did not seek disciplinary action for this incident because more than 180 days had elapsed since it occurred. Mother testified that the Arlington police lied about the incident.

[18]Father testified that he did not assault the Aaron's Rental employee but had a disagreement with him. He asked the employee to leave, but when the employee refused, Father "exited [his] home and [the employee] was just in the way of the door."

have motivation to find a job if he got his children back. Father testified that in December 2010 he was court-ordered to obtain gainful employment and agreed that he had not come close to following that order. He testified that he had known about the trial since January 2012 and that he had not tried to get a job. He also testified that he had not tried to find a job because he suffered from major depression.

Father testified that he first went to Helen Farabee (MHMR), the local mental health center, in April 2001 and was diagnosed with Posttraumatic Stress Disorder and depression. Father testified that he met with Dr. Decena once every three months from 2001 until 2004. He testified that he stopped seeing Dr. Decena in 2004 and did not see another mental health professional until March 2011. He testified that he went back to MHMR in March 2011 and saw Kevin Thompson once a week until November 2011.[19] Father testified that he stopped seeing Thompson because he had completed the behavior plan Thompson had created to help him cope with depression. However, Thompson testified that he stopped seeing Father because the staff felt like Father humored them by going through the motions.

Father testified that he applied for social security benefits in August 2011 and that he listed major depression as his disability with a disability start date of March 2011. He testified that his application for social security was denied.

---

[19]Thompson testified that he is a Licensed Professional Counselor and a Licensed Professional of the Healing Arts.

13

Father also testified that he answered discovery in May 2011 and did not disclose that he suffered from depression and that he never asked CPS to get him help for his depression.

Father testified that he was arrested by the Arlington Police Department for harboring Mother, but he denied that he had harbored her. The Arlington Police Department's Arrest Warrant Affidavit states that on May 29, 1999, Father shouted at officers to get out of his home and that he aggressively approached an officer, grabbed his arms, and pushed him backwards. Father denied grabbing or struggling with the officer.

At the time of trial in March 2012, Mother was in Dawson State Jail serving a fourteen-month sentence for a probation violation.[20] Mother had an extensive criminal history and testified that she had several charges and convictions for theft because she "had a problem . . . [w]anting more than [she] really needed at the time." She testified that she had served a previous fourteen-month sentence at Dawson State Jail. Mother could not recall all of her criminal charges and testified that she did not know how many times she had been charged with theft. She added that her criminal history did not contain convictions for acts of violence and that her convictions were mostly for theft. Mother testified that she wrote 298 bad checks totaling $27,000.

---

[20]Mother's initial charge was fraudulent use and possession of identifying information. Mother's probation was revoked because she committed a new theft by check offense while on probation.

14

Department caseworker Linda Johnson testified that she thought Mother was going to jail in December 2010 and that she developed Mother's service plan accordingly.[21]  Johnson testified that Mother complied with most of her service plan; Mother signed the HIPAA release, participated in available services in jail, summarized the parenting information sent to her in jail, and underwent a psychological evaluation.  Mother testified that she took a parenting class but refused to discuss domestic violence because she felt that her parenting trainer was investigating her and trying to place criminal charges on her and Father.  Mother also testified that there was no domestic violence in her home and that she would not discuss domestic violence.  Johnson testified that the most important part of Mother's service plan was the requirement that she obtain and maintain safe housing that was free from domestic violence once she was released from jail.

Mother testified that she told Johnson that she had no intention of leaving Father.  Johnson testified that she previously told Mother that the Department's position was that it would not return the children to her as long as she was living with Father.  Mother testified that the Department indicated to her that it wanted her to end her marriage to Father and that she made it clear to the Department that she had no intention of ending her marriage.  She then testified that Johnson never told her that she had to divorce Father but that Johnson had told her that

_____

[21]Mother did not go to jail until March 2011.

15

there could come a point when she would have to choose between her husband and her children, since the Department would have to remove the children from the family violence. Johnson testified that the only portion of Mother's service plan that she had not complied with was maintaining a home free from domestic violence. She testified that this noncompliance was enough to determine that Mother failed to comply with her service plan.

Johnson testified that she developed Father's service plan and discussed the plan with him in December 2010. Johnson testified that Father complied with parts of his service plan. Father complied with the law, refrained from committing illegal acts, had not allowed people with a criminal or drug lifestyle in his home, provided information on people living in his home to CPS for them to run background checks, completed parenting classes, and completed a psychological evaluation.[22] However, Johnson testified that Father did not notify her of his change in phone number, did not keep in frequent telephone contact with her, and did not regularly meet with her. Johnson testified that Father did not complete a budget form or sign his MHMR release.[23] She also testified that Father failed to obtain and maintain a legal source of income.

Johnson testified that she first heard of Father's extensive MHMR issues during trial. Johnson testified that she met with Father in April 2011 and that he

---

[22]Johnson testified that Father's psychological evaluation from the previous case carried over and counted for the current case.

[23]Father testified that he did sign the release.

16

did not mention that he went to MHMR the previous month and did not disclose his major depressive or posttraumatic stress disorders. She testified that Father was to attend counseling with Dr. Vandehey and receive intense education in the effects of domestic violence on the family, but Father did not attend the sessions.[24] She also testified that she first heard that Father saw Kevin Thompson during trial and that Thompson is not the court-ordered counselor mentioned in Father's service plan.

Father called Robert Campbell and Brian Brunker as character witnesses at trial. Robert Campbell, a family friend, testified that the children's relationship with their parents appeared normal. Campbell testified that when he spent time with the family he did not notice anything out of the ordinary and that the children had never alleged that anything had happened to them while in their parents' care. Campbell then admitted that he did not know the children's names or ages or which children were involved in the termination case. Campbell also testified that he was never around the children without Mother and Father present and that he had only been to their home around six times in the past twenty years.

Brian Brunker, a Wichita Falls police officer, testified that he lived next door to the family. Brunker testified that he had seen the children play in the backyard and that he had never observed anything unusual about their demeanor. He

---

[24]Johnson testified that Father saw A.J. Madden in the previous case and that Father stated he did not like Madden. Johnson arranged for Father to see Dr. Vandehey, but when Father did not attend an appointment, Dr. Vandehey refused to see Father.

testified that the children had never approached him and claimed that their parents abused them and that he had never noticed any marks or cuts on the children that appeared to be the result of physical abuse. However, Brunker testified that the only conversations he had with the children were when they had asked permission to retrieve tennis balls from his backyard. Brunker testified that he did not know that Mother had written bad checks, that Father was indefinitely suspended by Forest Hill Police Department, what went on inside Father's household, or the specifics of the SWAT team incident. Brunker also testified that he did not have a close relationship with Bethany, Brittany, or Brandon and that he did not know much about Father.

Father testified that his biggest problem in the past was his overwhelming sense of loss but that he was now positive about the future and believed that his family was salvageable. Father testified that he felt that he and Mother could provide for the children emotionally and physically. He also testified that the children would have to become reaccustomed to the home environment and his rules.

Father testified that "there [were] a lot of lies within [Bethany's] deposition." He testified that all of the allegations against him were false and that he did not think this should be a termination case. He also testified that termination was not proper in a case where the parent routinely looked at female children's genitalia, beat and choked a child, or beat and choked the other parent. He further

18

testified that termination was not proper in a case where a parent routinely committed criminal behavior and had been sent to prison.

Mother testified that M.R. lived with Father and paid his bills and rent. Father testified that M.R. was sixty-three, worked full-time, had stomach and lung cancer, and received chemotherapy treatments every two weeks. Father testified that M.R. will assist them when Mother is released from jail but that he had not made arrangements for where M.R. would live. He testified that he did not have a plan for living arrangements if his children came home with him.

Mother testified that she believed her family was salvageable. She testified that the way she parented was the correct way for her children and that the children wanted more freedom and had "ma[de] everything up." She testified that Bradley fabricated the allegations of family violence that led to the first removal. She testified that Bethany and Brittany lied about Father checking them because they did not like the rules at home. She testified that she did not believe her daughters and did not believe that Father had ever checked them. Mother testified that she would deal with Bethany's and Brittany's allegations that Father checked them by going to counseling because she believed that Father never checked the children. Mother also testified that she was surprised that Brandon discussed violence between her and Father and between Father and Bethany.

Bethany, Brittany, and Brandon testified that they love and miss Mother. They also testified that they love Father even after everything he had done. Brittany and Bethany testified that they did not want to live with Father and that

19

they did not feel safe living with him. They testified that they would live with Mother but that she would just go back to Father or would let them see Father. Bethany and Brittany testified that they wanted Mother's and Father's parental rights terminated. Brandon also testified that he did not want to live with Mother or Father.

Bethany testified that she felt that Mother began choosing Father over the children when he moved back in after the 2009 removal. She testified that she wished Mother would choose her over Father but that she did not think Mother ever would. Bethany testified that she did not think that Father would ever change. Bethany testified that she did not want to go home; that she wanted to be adopted; that she now participates in basketball, track, and volleyball; that she is happy in her current placement; and that she wants to live there permanently. She also testified that she understood that there was no guarantee that her current foster parents would adopt her but that she still wanted Mother's and Father's parental rights terminated. Brittany testified that she wants Mother's rights terminated partly because she kept going back to Father. She testified that she wanted Father's rights terminated because he was strict, because he hit people, and because she is afraid of him at times.

Johnson testified that the children's current foster parents want to adopt them as a sibling unit and that the Department intends for the children's current foster parents to adopt them if the parents' rights are terminated. Court-Appointed Special Advocate (CASA) Gary Cardwell testified that he had

20

observed Bethany, Brittany, and Brandon in their current placement and that they appeared happy and well-adjusted. Cardwell testified that, in his opinion, it is in the children's best interest for Mother's and Father's parental rights to be terminated. Johnson also testified that it is in the children's best interest to have Mother's and Father's parental rights terminated and that it would impair the children's physical and emotional development if Mother or Father were appointed as managing conservator.

### III. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, No. 11-0282, 2012 WL 2617604, at *1 (Tex. July 6, 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a). Due process demands this heightened standard because "[a] parental rights

termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 2012 WL 2617604, at *1 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder

22

could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D), (E), or (O) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Statutory Endangerment

Father argues in his first and second issues that the evidence is factually insufficient to support the jury's statutory endangerment findings.

### A. Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious

course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

## B. Discussion

Father argues that his family violence did not endanger Bethany, Brittany, and Brandon but that it instead had "a salutary effect" on them. He argues that there is no evidence that the children suffered any injuries other than transitory ones and that his discipline had no long-term, adverse effects on the children. The Department responds that there is ample evidence that Father endangered the children, and it points to evidence of Father's lengthy history of domestic violence. Specifically, the Department points to evidence that Father assaulted Mother on an ongoing basis, that the children witnessed the abuse, and that Father also assaulted the children, and it urges that Father's disciplinary techniques far exceeded the bounds of what society might describe as those employed by a strict parent.

25

There is also evidence that Father checked Bethany's and Brittany's genital areas for evidence of sexual activity. "It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re R.G.*, 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *see also R.W.*, 129 S.W.3d at 742. Evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children. *See In re K.M.M.*, 993 S.W.2d 225, 227 (Tex. App.—Eastland 1999, no pet.). Father argues that his actions did not cause his daughters physical harm, but he ignores the emotional or psychological impact of his conduct.

Overall, Father's arguments are little more than efforts to minimize the considerable evidence supporting the jury's endangerment findings. While the evidence is in many respects conflicting given his and Mother's denials at trial, the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See J.P.B.*, 180 S.W.3d at 573; *see also In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness."). Contrary to Father's contentions, the jury could have determined that Father endangered Bethany, Brittany, and Brandon.

26

Applying the appropriate standards of review, we hold that the evidence is factually sufficient to support the jury's findings that Father engaged in conduct or knowingly placed Bethany, Brittany, and Brandon with persons who had engaged in conduct that endangered their physical or emotional well-being and that he knowingly placed or knowingly allowed Bethany, Brittany, and Brandon to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *see also H.R.M.*, 209 S.W.3d at 108. We thus overrule Father's first and second issues.[25]

## V. Best Interest

Father argues in his third issue that the evidence is factually insufficient to support the jury's finding that termination of his parental rights is in the children's best interest. Mother argues in her sole issue that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

---

[25]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We thus need not address the sufficiency of the evidence under section 161.001(1)(O). *See id.*; *see also* Tex. R. App. P. 47.1.

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when

28

appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

Father contends that his "hands-on approach to family discipline" has not caused his children any substantial injuries. Father also contends that Bethany and Brittany have not suffered physically or mentally from the sexual inspections. Mother points to the strong presumption that keeping children with their parent is in the children's best interest, and she argues that she has always provided her children with a safe environment. Mother contends that her children have not suffered any physical harm, that there is no domestic violence in her home, and that Bethany lies and manipulates others. Mother further contends that while she does have a criminal history, she used the stolen money to provide for her family.

Exposure to domestic violence is relevant when considering a child's best interest. *See In re R.R., Jr.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.); *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). A parent's extensive criminal record also reflects on the best interest of the children in maintaining a relationship with that parent. *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc); *see also In re J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet.

denied) (holding that incarceration is one factor courts can consider when determining the best interest of the children in a termination case). Moreover, a parent's noncompliance with a service plan may also affect a factfinder's consideration of the children's best interest. *M.R.*, 243 S.W.3d at 821.

The jury heard that Bethany, Brittany, and Brandon love Mother and Father. But the jury also heard Bethany testify that she wants Mother's and Father's parental rights terminated, that she does not want to go home, and that she wants to be adopted. Brittany testified that she wants Mother's and Father's parental rights terminated, and Brandon testified that he does not want to live with Mother or Father. The jury heard evidence that the children appear happy and well-adjusted in their current placement, that their current foster parents want to adopt them, and that the Department intends for the children's current foster parents to adopt them if their parents' rights are terminated.

In contrast, the jury heard evidence that Father has choked, punched, and slapped the children and that he checked Bethany's and Brittany's genital areas for evidence of sexual activity. The children do not feel safe living with Father. Mother has a lengthy criminal history and was serving her second fourteen-month sentence at the time of trial. Also, Mother has not acknowledged Father's domestic violence or abuse of the children and seems intent upon living with Father upon her release from jail. Mother and Father denied all allegations against them and argued that their children were lying.

30

The record contains evidence of Father's history of physical and sexual abuse and his pattern of denial and refusal to adjust his conduct, even when faced with the possibility of having his parental rights terminated. The record also reflects Mother's history of domestic violence directed at Father, her unwillingness to comply with her service plan, and her lengthy criminal history. Applying the appropriate standards of review, we hold that the evidence is factually sufficient to support the jury's finding that termination of Father's parental rights is in Bethany's, Brittany's, and Brandon's best interest. *See H.R.M.*, 209 S.W.3d at 108 (discussing factual sufficiency standard of review). We also hold that the evidence is legally and factually sufficient to support the jury's finding that termination of Mother's parental rights is in the children's best interest. *See id.*; *see also J.P.B.*, 180 S.W.3d at 573 (discussing legal sufficiency standard of review). We therefore overrule Father's third issue and Mother's sole issue.

## VI. Conclusion

Having overruled Father's and Mother's respective dispositive issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DELIVERED: January 4, 2013

31